No. 13,923.

CHARLES KAISER, ETC., VS. NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

### SYLLABUS.

Where a boy of thirteen walks from one side of a street, on which there are double car tracks, towards the other side, at night, and, without stopping, collides with a car, blazing with light, loaded with passengers, and moving at the rate of six miles per hour, which there was nothing to prevent his seeing and hearing, there can be no recovery for injury resulting from such collision.

APPEAL from the civil district court, parish of Orleans.—*Sommerville, J.*

*Louis P. Paquet,* and *Andrew J. Murphy,* for plaintiff, appellant.

*Dart & Kernan,* for defendant, appellee.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

MONROE, J. The plaintiff alleges that his minor son, for whose use and benefit he sues, had his foot cut off by one of the defendant's cars through the criminal negligence of the defendant and its servants, and he prays for damages. The answer is a general denial and a plea of contributory negligence.

The evidence shows that, upon the evening of February 21st, 1900, Peter Kaiser, the injured boy, with his older brother, Charles, left their home at the corner of Fourth and Franklin streets in this city,

with the intention of going to Canal street, in order to see an illuminated procession which was expected to appear.

They were city bred, intelligent, school boys, accustomed to electric cars and other perils incident to street travel, and were thirteen and fourteen years of age, respectively. Near the lower crossing of Perdido street, on Baronne, at about five minutes past seven o'clock, Peter Kaiser's right foot was crushed under the wheel of car No. 185 of the defendant's Jackson avenue line which was then going in the direction of Canal street, upon the eastward, or river, side track. The car was moving at about schedule speed and was carrying a large number (seventy, or more), of, registered, passengers, who were packed in the seats and the aisles and upon both platforms, and it seems likely that there were others, not registered, upon the bumper, outside of the rear platform, and hanging upon the hand rails, with their feet upon the steps of one, or both, of the platforms. Neither the conductor nor the motorman were aware, at the time, that any accident had occurred, nor can it be said that any of the passengers were aware of it, and the car proceeded on its way to Canal street. There seems to be no doubt that the little boy's foot was crushed by the front wheel on the left, or woods, side. Nungesser and Monaghan, two passengers, were occupying the front seat on that side, the former next to the aisle and the latter next to the window, which was open. Nungesser testifies that about Poydras street, one square above the scene of the accident, two boys caught on to the car, with their feet upon the step of the front platform, supporting themselves, no doubt, by hanging on to the after hand rail with their bodies swinging back, and that, as the position was one of peril, by reason of the fact that they were liable to be knocked off by a car going up on the parallel, and adjacent, track, the situation attracted his attention and he commented on it to Monaghan, and that, in passing Perdido street, he felt a jar and remarked, "There is somebody run over," to which Monaghan replied, "No, the car would have stopped." Monaghan's testimony is somewhat peculiar. He, at one time, appears to testify that the boys were on the car, and that Nungesser called his attention to the fact, but is afterwards unable to say whether they were there or not, and is unable to recall any conversation with Nungesser on the subject, though he fully corroborates that witness as to the remarks above quoted. Bonaparte, a negro boy, was standing on, or just inside, the sill of the rear door of the car, and testifies that, at Perdido street, he heard someone outside of the car

call out that a "boy got run over." Beyond this, there is absolutely no evidence that anyone on the car knew or suspected, or had any reason to suspect, that an accident had occurred. The story that the injured boy tells is fairly included in the following excerpt from his cross-examination—the first question referring to his starting from his home at the corner of Fourth and Franklin streets, to-wit: "Q. You walked on Fourth to Baronne and on Baronne to Perdido? A. Yes, sir. Q. Did you pass many of these electric cars on Baronne street? A. Yes. Q. There were plenty of boys hanging on the cars? A. No. Q. You did not see any people hanging on them on the back platform, or the front? A. No. Q. But you saw plenty of these cars coming down the street loaded with people, didn't you? A. Yes. Q. And you saw plenty of them going up town? A. Yes. Q. Both full of passengers? A. Yes. Q. On which side did you come down Baronne street? A. On the woods side. Q. When you got to Abbott's store, you looked in the window? A. Yes. Q. And you left your brother there and you went on by yourself? A. Yes. Q. Until you got the lower side of Perdido street? A. Yes. Q. Did you go on the crossing there? A. Yes. Q. What crossing? A. Down town crossing. Q. Did you walk or run over the crossing? A. I walked over. Q. You say you looked up and down the street? A. Yes. Q. What was that for? A. To see if a car was coming. Q. You knew that there was a car going to come there? A. Yes. Q. An you looked to see if the car was coming? A. Yes. Q. And you did not see it come? A. No. Q. And then you walked over? A. Yes. Q. Then what hit you, what was it that struck you? A. The car. Q. What part of the car struck you? A. The front part. Q. What part of the car, was it the woods side of the car? A. Yes. Q. The woods side? A. Yes. Q. Which way was your face turned when you were struck? A. Toward the river. Q. You did not hear the car? A. No. Q. And you did not see it? A. No. Q. And yet it hit you? A. Yes. Q. How came it that you did not see the car when it ran over you? A. I don't know. Q. There were electric lights burning in the car, did not the car have a headlight in front? A. Yes. * * * Q. How did you get your foot under the front wheel, you were not on the track? A. I had this foot right on the track. Q. When you were struck, you had one foot on the track? A. Yes. Q. You had only one foot on the track? A. Yes. * * * Q. You had just put your foot on the rail when

you were struck? A. Yes." Charles Kaiser testifies that Peter left him at Abbott's window and went on to Perdido street and that his attention was next attracted by the scream which followed the accident. He also testifies that he heard the witness Stagno call out, "There is somebody run over," and that the car went on. Both boys deny they had caught on to the car. Stagno testifies that he was walking down the middle of Baronne street, with his wife and child; that about half-way across Perdido street, he fell behind his companions and, being between the two Baronne street tracks, he saw a boy crossing from the lower woods corner of Perdido street; that he turned his attention from the boy and, a moment afterwards, heard a scream and found that the accident had happened. He refuses, however, to identify the boy who was crossing the street with the boy who was injured. This witness also testifies that he called out, "There is a boy run over."

Abovitch, who is the only witness, besides the boy himself, who professes to have seen the accident, was on the woods side of Baronne street, above Perdido, walking down. He undertakes to give the facts with considerable detail, but falls into several errors. Thus, he testifies, with great positiveness and reiteration, though his attention was repeatedly called to what he was saying, that the car which inflicted the injury passed him, going at unusually high speed, whilst he was in the middle of the square between Poydras and Perdido streets, walking in the direction of Perdido street, and, although he does not claim to have been walking very rapidly, he tells us that, when the accident occurred, on the lower crossing, he was within ten feet of the upper corner. This statement, he afterwards returned to the stand to correct, saying that he was twenty feet from the corner.

He also testifies that he observed that the number painted on the side of the car was 180, though, after the accident he could not have seen it, and, before the accident there was no reason why he should have observed it, as there were cars passing and re-passing every few minutes, and it is hardly likely that he noticed the numbers of all of them. Moreover, the number of the car was 185, whilst 180 was the number of the car that came up on the other track, and, because it was the only car that was stopped at the corner just after the boy had been picked up, was supposed by some persons to have been the car by which the injury was inflicted. This witness also testifies that no bell was rung on the car that ran over the boy, and, although Stagno, who was much

nearer, was unable, because of the darkness, as he says, to identify the boy who was injured with the boy whom he had, a second before, seen crossing the street in the direction of the car, Abovitch was able, whilst making the other observations which have been mentioned, to notice that Peter Kaiser had just extended his *left* foot forward on to the defendant's track when he was struck by the car.

Another witness, Marks, who was walking up Baronne street, on the woods side, and was a short distance below the corner of Perdido, speaks of having seen " the form of a boy tumbling into the street," near the passing car, and also of having seen a boy crossing, from the corner he, the witness, was approaching, in the direction of the point at which the " tumbling " took place, but there appears to have been no such continuity of observation as to enable him positively to identify the boy who was " crossing " with the boy whom he saw tumbling a moment afterwards. This witness also states that he was on his way to supper and was walking rapidly. Being asked, " How fast do you suppose you were walking—at what rate?" he replied, " About twenty miles per hour. Q. You were going pretty fast? A. Yes, maybe more than that," etc.

Ott, the conductor, testifies that he was on the rear platform; that, after passing Poydras street, his attention was called, by the driver of a passing wagon, to the fact that there was a boy hanging on the side of the car, or platform, at that end, and that he saw the boy· and told him to get off. He also speaks of having seen a boy approaching the car from the woods side on Perdido street, and of having seen a boy standing between the tracks, but he states that he heard no one hail him and say that a boy had been run over, and he was not aware, at that time, and had no reason to believe, that an accident had happened. He further testifies that he has been a conductor for thirteen years.

Reiman, the motorman, testifies that the car was crowded; that there were four men on the front platform, to his left, and one to his right, but that they stood back so far as not to obstruct his view of the street. The car, he says, was going at the usual speed, *i .e.,* " five points, or about six miles an hour," and that he was not aware, at the time, that any accident had happened. He was asked, " It is said that a boy about thirteen years of age tried to go across Baronne street, at Perdido, and that he was struck by the front part of the car, just as he put his foot on the rail, did such an accident happen to your car?" He answered, " No." He was asked, " Could it have happened without your knowing

it?" He answered, " No, it could not." He states that the four passen-
gers to his left would have prevented his seeing a boy holding on to the
" grab handle " of the front platform, and he does not know whether
there was a boy so holding on. This witness was not in the employ of
the defendant at the time that he testified. He had been a conductor for
five years without causing damage to person or property and had left
the service and had gone to work for a cistern-maker.

Perke is a motorman who was in charge of car No. 180, which was
coming up Baronne street and had reached Gravier street, two squares
below the scene of the accident, when the accident occurred. He testi-
fies that as the down-coming car, being car 185, was leaving Perdido
street, he saw a boy fall, and that as the car approached him he saw
another boy hanging to the side, and called to him to get off. When he
reached Perdido street, he slackened the speed of his car and heard
somebody say, " That a boy had got his leg cut off," and some one took
the number of his car.

Prester was the conductor of car 180. He also testifies that, on reach-
ing Perdido street, some one said, " That was the car," referring to car
180, and that he then learned that an accident had happened. He also
testified that there were boys hanging on to the car that passed down.
This witness had likewise left the defendant's employ, after four years'
service, with a certificate of good character, and was working elsewhere
when he testified. It is abundantly shown that the car by which the
injury was inflicted was brilliantly illuminated, with an electric head-
light and some fifteen incandescent lights, inside, and it is not sug-
gested that there was anything which could have prevented the boy
who was hurt from seeing and hearing it for several squares.

## OPINION.

There are but two, possible, hypotheses as to the manner in which the
accident occurred: the one, that the little boy walked from the "woods"
side of Baronne street toward the river side, that he crossed the defend-
ant's up-town track in safety, and having made one step on to the down-
town track, was struck by the car on that track; the other, that he and
his brother were hanging on by the " grab handle " of the front plat-
form of the car and that he fell off, or fell under the wheel after he had
jumped off. And, upon neither hypothesis can the plaintiff recover.
Accepting the statement of the little fellow himself, and taking the

view of the testimony most favorable to the claim which is made on his behalf, he walked, without stopping, from the banquette on the "woods" side of Baronne street, until he collided with the car or was struck by it. The moment before he took the one, and only, step which he had time to take on to the defendant's down-town track, it was entirely within his power to have stopped. And it was not to have been antici- pated, in view of the fact that the car, blazing with light, loaded with passengers, moving at the rate of six miles per hour, and making a noise that could have been heard a square or two away, was practically on him, that he would have taken that one step which placed his foot beneath the wheel; nor, was it within the limit of human power, after that step had been taken, to have stopped the car in time to have avoided the accident, since the accident occurred before a second step could follow the first, and there is no great interval of time between the steps of a boy of thirteen, who is on his way to see a procession, the lights of which are reddening the sky just before him. We need not deal with the theory suggested on behalf of the defense that the boy was one of those who had been hanging on the car. Nor is it necessary that we should enter into any extended discussion of the supposed presumption of negligence arising from the fact that the conductor and motorman did not know that the accident had occurred, and failed to hear the calls afterwards. It seems to us to be reasonably certain, not only from the testimony of the defendant's, but from that of the plaintiff's, witnesses, that the boy was never in front of the car, where he might have been seen by the motorman, but that the point of collision was aft of the bumper and guard and just forward of the front wheel. As to the calls of Stagno and Marks, that, a boy had been run over, they were cer- tainly uttered not only after the fact, but after those witnesses had had time to realize what had happened, and, in the meanwhile, the crowded car was speeding down the street. It is not surprising, therefore, that the calls were not heard or understood. The case was tried in the dis- trict court without a jury. The learned judge before whom it was tried reached the conclusion that the plaintiff was not entitled to recover. We are of the same opinion, and the judgment is accordingly affirmed.